# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 6, 2013

## STATE OF TENNESSEE v. LASHUN GRAY

**Appeal from the Criminal Court for Shelby County**
**No. 10-00629   James M. Lammey, Jr., Judge**

**No. W2012-00415-CCA-R3-CD  -  Filed June 26, 2013**

## STATE OF TENNESSEE v. STANLEY WILLIAMS[1]

**Appeal from the Criminal Court for Shelby County**
**No. 10-00629   James M. Lammey, Jr., Judge**

**No. W2012-01052-CCA-R3-CD**

The Defendants, Lashun Gray and Stanley Williams, were tried jointly before a Shelby County Criminal Court jury. Defendant Gray was convicted of attempt to commit first degree murder, a Class A felony, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202, 39-12-101, 39-17-1324 (2010). He was sentenced as a Range I, standard offender to consecutive sentences of twenty-four years for the attempted first degree murder conviction and ten years for the firearm violation, for an effective thirty-four-year sentence. Defendant Williams was convicted of first degree murder, attempt to commit first degree murder, a Class A felony, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See id.* He was sentenced to life imprisonment for the first degree murder conviction and as a Range I, standard offender to consecutive terms of twenty-four years for the attempted first degree murder conviction and ten years for the firearm violation, for an effective sentence of life plus thirty-four years. On appeal, Defendant Gray contends that (1) the evidence is

---

[1] The Defendants were indicted and tried jointly. Defendant Gray filed his notice of appeal on February 9, 2012, and Defendant Williams filed his notice of appeal on February 16, 2012. The Defendants were each given a unique Court of Criminal Appeals docket number, but the cases were consolidated for purposes of this appeal on May 21, 2012. The docket number assigned to Gray became the primary docket number.

insufficient to support his conviction for attempted first degree murder, (2) the trial court erred by allowing the medical examiner to testify about the effects of a gunshot wound on a living person, and (3) the court erred during sentencing. Defendant Williams contends that (4) the evidence is insufficient to support his convictions for attempted first degree murder and the firearm violation, and (5) the court erred in instructing the jury regarding criminal responsibility. We affirm the Defendants' convictions, but because of inappropriate sentences, we reverse the Defendants' judgments for employing a firearm during the commission of a dangerous felony and remand the case for entry of judgments reflecting six-year sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Joseph S. Ozment (on appeal) and Larry Eugene Copeland, Jr., (at trial), Memphis Tennessee, for the appellant, Lashun Gray.

Coleman Garrett (at trial and on appeal) and David Stowers (on appeal), Memphis, Tennessee, for the appellant, Stanley Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Hagerman and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a shooting at a Shelby County night club on October 18, 2009, in which Jimmie Johnson died as result of a single gunshot wound and Eldridge Donaldson received a gunshot injury. At the trial, Patricia Thomas, Mr. Johnson's mother, testified that her son was thirty-one years old when he died and that she last saw him the day he died. She said the Defendant drove her and the Defendant's son to her daughter's home. She said the Defendant and his girlfriend left her daughter's home around 1:00 a.m. and went to a party at the Boom Boom Room, a local nightclub. She denied attending the party. She learned that a shooting occurred at the club, that Mr. Johnson was taken to the hospital, and that he died as a result of his injuries. On cross-examination, she stated that Mr. Johnson was 6'7" and weighed about 245 pounds. She said that although Mr. Johnson drank alcohol, he did not drink the night of the shooting.

April Campbell testified that Mr. Johnson and her sister, Janice Campbell, were dating at the time of Mr. Johnson's death and that she attended a party at the club on October 19, 2009. She said that she arrived around 11:00 p.m. and that her sister and Mr. Johnson arrived at 1:30 a.m. She said about twenty people were inside the club at that time. She said Mr. Johnson bought a few drinks and brought them to the table. She said that a man named "Booka" knocked over Mr. Johnson's drink and that Mr. Johnson asked Booka to apologize. She said "Junior" was standing near the table and heard Mr. Johnson ask Booka to apologize. She heard Junior say to Mr. Johnson, "What the f--- you all a n----- for - you all talking to my young n----- for?" She stated that Defendant Williams said something to Mr. Johnson and that they began to fight. She said no firearms were used during the fight. She said Defendant Gray and the people with the Defendants "jumped" Mr. Johnson. She said that when the fight ended, the Defendants ran outside. She stated that she, her sister, and Mr. Johnson decided to leave but that as they were leaving, Williams entered the club shooting at them. She said that they ran and gathered near the bar, that she saw Williams shoot Mr. Johnson, and that she heard four gunshots. She said she ran to the kitchen and saw Gray walking toward Mr. Johnson and carrying a handgun. She denied seeing anyone else with a gun that night.

On cross-examination, Ms. Campbell testified that the Defendants were already at the club when she arrived. She denied drinking and smoking drugs. She said that about thirty minutes after she arrived, an argument related to drugs occurred outside. She said that the Defendants and Booka went outside but that she stayed inside. She agreed her sister stated that Defendant Gray shot Mr. Johnson and said she did not see Gray fire his gun. She said that Gray entered the club after Defendant Williams shot Mr. Johnson. She agreed her sister stated that Gray shot Mr. Johnson after Williams shot him. She said she thought Mr. Johnson was shot twice in the stomach.

Ms. Campbell testified that before she saw Defendant Williams shoot Mr. Johnson, she saw Williams arguing with two men and saw the Defendants fighting a group of people on the stage. She said that she knew Williams by sight but not by name before the shooting. She said that Mr. Johnson and Booka argued about Booka's spilling Mr. Johnson's drink and that the Defendants fought with a group of people on the stage. She agreed the fight involving Mr. Johnson and the Defendants occurred next.

Ms. Campbell testified that while Mr. Johnson and the Defendants were fighting, Junior told Defendant Williams to "go get the chopper," which she interpreted as Junior telling Williams to get a gun. She said that Williams said something when he entered the club with the gun, although she could not understand him. She agreed she told the police that Williams said, "There that b---- go." She admitted smoking marijuana at 6:00 p.m. the night of the shooting but denied being "high" at the time of the shooting.

-3-

Ms. Campbell testified that although she did not know Defendant Williams's name the night of the shooting, she told the police that she saw a young man wearing brown chase Mr. Johnson through the club and shoot him. After she learned Williams's name, she provided it to the police. She said that when she arrived at the club, she saw guns in the trunk of a car parked near the front door.

Jamaica Cartwright testified that she went to the club with a group of people for a birthday party the night of the shooting and that she arrived around 9:00 p.m. She said that she saw a "verbal fight" between Antoine Gunn and a group of men, that Mr. Gunn was drunk and arguing with everyone, and that the "fight" occurred outside the club before Mr. Johnson arrived. She agreed she smoked marijuana at the time of the fight.

Ms. Cartwright testified that Mr. Johnson arrived, that she returned to the club, and that she saw another fight. She stated that she stood near the table with the alcohol and that she saw Mr. Johnson pour a couple of drinks and sit in a booth. She said a fight began on the dance floor between several men. She said she also saw a fight involving Mr. Johnson. She said she ran outside and saw several men standing at the trunk of a white Buick. She said one of the men loaded a gun. She stated that she ran inside the club to warn everyone but nobody heard her because of the loud music and fighting. She said she heard gunshots outside the club and saw that Eldridge Donelson had been shot. She said she got under a table and called 9-1-1 when she saw the man with the gun enter the club. She said she heard five gunshots and screams.

On cross-examination, Ms. Cartwright testified that she went outside the club multiple times on the night of the shooting. She said that she did not see guns during the fight on the dance floor and that half the people at the club were involved in the fight. She agreed she was hit during the fight. She said that although she saw five people at the trunk of the car when she ran outside the club, only one was loading a gun. She denied seeing the face of the person who entered the club with a gun or seeing who shot the victims. She said that she saw Mr. Johnson fighting, that he was only "helping his family," and that he did not start the fight.

Janice Campbell testified that on October 18, 2009, Mr. Johnson was her boyfriend and that they went to a birthday party for Mr. Johnson's cousin at the club. She said that they met her sister, April Campbell, at the club and that they sat at a table near the dance floor. She said that Mr. Johnson left the table to get a drink and that she saw Booka spill a drink on Mr. Johnson. She said Mr. Johnson returned to the table, told her what happened, and walked to the dance floor. She said a fight began on the dance floor, which involved Mr. Johnson, the Defendants, and other people who were on the dance floor.

-4-

Ms. Campbell testified that she grabbed Mr. Johnson and ran toward the door, that Defendant Williams entered the club with a gun, and that Williams shot Mr. Johnson in the stomach. She said she also saw Defendant Gray shooting a gun. She said that Gray was "the second shooter" and that he fired his gun "everywhere." She said that Mr. Johnson was still standing after Williams shot him and that he fell after Gray ran through the club shooting. She said Williams seemed mad and aimed his gun at Mr. Johnson. She said that after the shooting, Williams left the club as though nothing happened. She thought Mr. Johnson was shot twice because the Defendants shot at Mr. Johnson, and she denied knowing he was only shot once.

On cross-examination, Ms. Campbell testified that she and her sister did not discuss who shot Mr. Johnson. She agreed that although she told the police the Defendants shot Mr. Johnson, she did not see Defendant Gray shoot Mr. Johnson. She did not know the number of people who entered the club after Defendant Williams entered with the gun. She said she ran when she saw the gun and dropped to the floor beside Mr. Johnson.

Ms. Campbell testified that the fight involving Mr. Johnson and the Defendants occurred near the dance floor and about fifteen feet from where she was sitting. She said she grabbed Mr. Johnson and walked toward the door to leave about seven minutes later. She said that the Defendants left the club before she and Mr. Johnson attempted to leave and that she saw Defendant Williams enter the club as she and Mr. Johnson walked toward the door.

Ms. Campbell testified that no fight occurred on the dance floor or stage before Mr. Johnson began fighting the Defendants. She agreed she saw Booka spill alcohol on Mr. Johnson but denied hearing what was said. She said she had never seen Defendant Williams before the night of the shooting. She said Williams wore a white t-shirt and khaki pants that night.

Ms. Campbell testified that she told the police Defendant Gray was responsible for Mr. Johnson's death and that she saw Gray shoot Mr. Johnson. She agreed that the police asked if Gray was with anyone that night and that she told the police there were "a lot of guys, but the boy walking up to [Jimmie] shot him." She said that two men walked up to Mr. Johnson, that Defendant Williams shot Mr. Johnson, and that Gray was with Williams. She clarified that she saw Williams shoot Mr. Johnson and that she thought Gray shot Mr. Johnson, too, because Mr. Johnson fell to the floor when Gray ran through the club shooting. She did not know that her seeing Williams shoot Mr. Johnson was not in her statement to the police, although she said she told the police she saw Williams shoot Mr. Johnson.

-5-

Ms. Campbell testified that Defendant Williams shot Mr. Johnson, that Mr. Johnson continued standing until Defendant Gray shot Mr. Johnson and that five minutes separated the gunshots. She heard Gray say, "I got you, B----," before shooting Mr. Johnson. She denied telling the police that Williams said, "I got you, B----," and that Williams shot Mr. Johnson in the stomach. She agreed she and her sister, April, saw different things that night and said they ran in different directions during the shooting. She said that Mr. Johnson became hot after being shot, that he took off his t-shirt, that he gave it to her, and that she gave it to a police officer. She said the shirt had two bullet holes. She agreed the statement did not mention the shirt or the bullet holes.

Eldridge Donelson testified that he was serving a sentence for aggravated robbery at the time of the trial and that he went to the club with his cousins the night of the shooting. He said that he drank and smoked marijuana at the club and that he left and returned thirty minutes later. He said that he saw someone knock a drink from Mr. Johnson's hand, that a fight occurred on the dance floor, which did not involve Mr. Johnson, and that Mr. Johnson became involved in a second fight with three or four men. He admitted joining the fight because he wanted to help Mr. Johnson, who was his cousin. He said the fight lasted thirty seconds to one minute. He said that the fight ended and that everyone began to leave.

Mr. Donelson, who was eighteen at the time of the shooting, testified that he left the club and walked to the parking lot, that he heard gunshots as he attempted to get into the car with Antuwn Gunn, and that he was shot in the stomach. He said he looked back when he heard the gunshots and saw a crowd of people and an unidentified man pointing a gun at him. He ran into the club after he was shot and crawled under a pool table. He stayed there until he saw other people running to the front door. He ran to the car, and his cousins took him to the hospital. He said that he awoke at the hospital two or three days later and that he underwent surgery and stayed in the hospital seven days.

On cross-examination, Mr. Donelson testified that he was not able to identify the person who shot him and that the shooter was about twenty feet away. He did not know if the gun was a semi-automatic pistol or a revolver. He agreed it was difficult to see inside the club because the lights were low. He said there was a lot of commotion and chaos.

Cecilia Williams testified that she arrived at the club around 11:30 p.m. for a birthday party and that she heard an argument when she arrived regarding someone vomiting or spilling a drink on someone's shoes. She denied that the people arguing fought, that the fight ended, and that they began dancing. She said she saw a fight that stemmed from Booka knocking over Mr. Johnson's cup. She said she saw beer bottles tossed, tables overturned, and men fighting. She said that she ran outside and saw a car by the front door and that the men inside the car grabbed guns. Although she did not recognize everyone, she said she saw

-6-

Defendant Williams with a handgun. She said she saw one of the men with a "big gun" and thought it might have been a "chopper - AK or SK." She said Williams entered the club with the gun.

On cross-examination, Ms. Williams testified that she told the police Defendant Gray shot Mr. Johnson. She agreed that although she knew who entered the club with the guns, she did not see who shot Mr. Johnson. She said there were about fifty or sixty people inside the club around the time of the shooting. She admitted drinking one pink lemonade with vodka. She said that about ten men with guns entered the club and that she heard gunshots from outside. She said she did not know Gray's full name at the time of the shooting.

Memphis Police Officer Will Bryson testified that he responded to the shooting and secured the scene until detectives arrived. He said he provided aid to Mr. Johnson before the paramedics arrived. On cross-examination, Officer Bryson testified that five to ten people were at the scene when he arrived, that he did not speak to anyone outside the club, and that he recalled speaking to three witnesses inside the club. He did not look for evidence in the parking lot.

Memphis Police Crime Scene Investigator Demar Wells testified that he arrived at the scene at 2:15 a.m. and that neither Mr. Johnson nor Mr. Donelson were there. He said he found one fired nine-millimeter shell casing and two fired forty-caliber shell casings. One nine millimeter shell casing was found outside the club, and three were found inside. He also recovered bullet fragments. He was familiar with assault rifles and said "chopper" referred to an AK-47 or SK assault rifle. He identified a photograph of a bullet hole in the wall and said he was able to recover the bullet from the wall.

On cross-examination, Investigator Wells testified that he found two forty-caliber shell casings near the front door and that the casings were about one and one-half feet apart. He said the bullet fragment was sent to the Tennessee Bureau of Investigation (TBI) for analysis. He did not see overturned tables or a lot of blood inside the club. He said the only evidence of a shooting outside the club was the single shell casing. He did not know how long the casing had been there and agreed he could not determine if the casing was from that night or a previous night. He found no evidence that an AK-47 was used inside or outside the club. He concluded that at least two handguns were used inside the club because a forty-caliber bullet would not fire from a nine-millimeter handgun due to the size of the bullet.

Memphis Police Officer Anthony Mullins testified that he obtained two of Mr. Johnson's t-shirts from Janice Campbell. He identified the shirts and examined them for holes. He stated that the first shirt had one oblong-shaped hole and two very small defects. He stated that the second shirt had two holes.

On cross-examination, Officer Mullins testified that the two defects could have been caused by a very small bullet fragment or might have been unrelated to the shooting. He said it was possible a small caliber bullet made the holes, such as a twenty-two or twenty-five caliber bullet. He said that the holes in the second shirt were about the same size and that the shirt had a blood stain. He agreed he did not know how the holes were created and did not know if the holes in the shirts matched the victim's wound. He said that he did not send the shirts to the medical examiner and that to his knowledge, the medical examiner did not request them.

Officer Mullins testified that he interviewed Cecilia Williams. He did not recall looking for anyone known as Boo or Junior. He said he recalled the name Marcus Hall but did not recall looking for him. He admitted being present during a portion of Janice Campbell's interview and said he provided photograph lineups and obtained the shirts from Ms. Campbell. He agreed April Campbell sent Janice Campbell a text message identifying Defendant Gray as a suspect. He said Janice Campbell did not know the shooter's name but could identify his face.

Shelby County Medical Examiner Miguel Laboy, an expert in forensic pathology, testified that he performed Mr. Johnson's autopsy. He observed an opening in Mr. Johnson's abdomen, an abrasion on his left cheek, multiple abrasions on the right side of his neck, and an abrasion on his back. He said the cause of death was a gunshot wound to the abdomen. He stated that the abdomen had many blood vessels and that a bullet passing through the area perforated arteries. He said that a person might lose blood slowly and that depending upon how the blood left the organs, a person might be able to perform many tasks. He said in Mr. Johnson's case, the bullet passed through his bowels and into the inferior vena cava, which caused blood loss in the abdomen. He said the wound did not cause "a sudden stop of doing anything." He agreed a person could remain conscious, talk, and move for a period of time after receiving wounds similar to Mr. Johnson's depending upon the rate of blood loss. He said Mr. Johnson's wounds might or might not cause a lot of blood loss. He concluded that Mr. Johnson was shot from an indeterminate range because no soot or stippling was found on his body. He said the toxicology analysis of Mr. Johnson's blood showed the presence of marijuana.

On cross-examination, Dr. Laboy testified that he retrieved the bullet from Mr. Johnson's abdomen. He said that the wound was cleaned and sterilized at the hospital, that soot and stippling might have been cleaned from the wound, and that it would be difficult to know whether soot and stippling were present on Mr. Johnson's wound. He said that Mr. Johnson was naked when his body arrived at his office and that he did not receive Mr. Johnson's clothing. He said he only found one gunshot wound.

Derias Pettis testified on behalf of Defendant Gray that he was at the club on the night of the shooting and that he arrived around 10:00 p.m. He said he went to the club with Gray, William Goliday, and Mario Lewis. He said that Gray and Mr. Goliday went to the dance floor while he sat at a table and that Mr. Johnson entered the club around that time. He denied that he drank alcohol or smoked marijuana that night. He said Mr. Johnson walked to the dance floor, threw "stuff up in the air," and told people "what he was going to do." He said that Mr. Goliday knocked Mr. Johnson's drink from his hands and that they began to argue. He said Mr. Goliday attempted to walk away, and he recalled Mr. Johnson's hitting Gray. He said that everyone on the dance floor began to fight, including Gray and Mr. Johnson. He said the fight lasted ten or fifteen minutes until he heard a gunshot. He said that he looked for Gray, that he found Gray, and that he heard a second gunshot when they reached the front door. He said that it was chaotic but that he and Gray ran to his sister's home after they reached the parking lot. He denied seeing Gray with a weapon.

On cross-examination, Mr. Pettis testified that Mr. Goliday was also known as Booka and that they grew up together. He denied discussing the shootings with Defendant Gray and said they did not know anyone died. He denied that Mr. Johnson and Gray fought that night. He said that Mr. Johnson fought with Defendant Williams and that Gray did not participate in that fight. He said he had known Williams for about five years and denied discussing the case with Williams. He said that Mr. Lewis drove him and the others to the club that night in a white Buick or Crown Victoria. He said that to his knowledge, nothing was inside the trunk. He denied looking inside the trunk or seeing anyone retrieve a gun from the trunk.

Mr. Pettis testified that he first saw Defendant Williams when Mr. Pettis entered the club. Mr. Pettis sat at a table near the dance floor and said the fight began about five minutes later. Defendant Gray fought a group of people, and Williams fought with Mr. Johnson. He did not know if Booka was involved in the fight. He said Mr. Johnson entered the club alone and walked to the dance floor immediately. He said Mr. Johnson was "throwing words . . . in the air." He said he heard Mr. Johnson mention Vice Lords and others talking about Crips. He denied being a Crip and said that to his knowledge, the Defendants and Booka were not members either.

Mr. Pettis testified that he heard the first gunshot around 10:30 p.m. but denied knowing who fired the shot. He said he did not see anyone with a gun when he ran out the front door. He admitted he did not call the police after the shooting. He denied knowing Junior but then said he did not see Junior inside the club. On redirect examination, he said the car in which he arrived was not in the parking lot when he ran from the club. He denied that Defendant Williams rode with him to the club in the white car and said Defendant Gray wore a purple and black "label jacket" the night of the shooting.

Karlos Miller testified on Defendant Williams's behalf that his father was a part owner of the club and that he helped provide security the night of the shooting. He said two parties were scheduled the night of the shooting. He said he saw one fight on the stage involving seven or eight people around 11:00 p.m. He said the shooting began about ten minutes after the fight ended. He said that he and Williams were looking for Mr. Miller's keys near the stage when the shooting began. He admitted Williams was a childhood friend and denied knowing the victims.

Mr. Miller testified that the first gunshot came from outside the club and that the next gunshot came from inside the club. He said he and Defendant Williams got under a table after the shot was fired inside the club. He heard three gunshots inside the club but denied seeing who was shooting. He denied knowing the number of guns being fired. He said that after the shooting, he stood and saw Mr. Johnson lying on the floor. He denied talking to the police about the shooting.

On cross-examination, Mr. Miller testified that the night of the shooting was the first time he had seen Defendant Williams at the club. He denied knowing Defendant Gray, Booka, and Mr. Lewis. He admitted Williams was involved in a fight at the club but did not know if Gray was involved. He denied that he ended the fight and said that he helped Williams get off the floor. He said Williams was going to leave but could not find his car keys and asked for his help. He denied Williams went outside, although he said everyone else went outside to watch a fight.

Mr. Miller testified that although he never found Defendant Williams's car keys, Williams left immediately after the shooting. He testified later, though, that he did not know when Williams left. He said he learned from Williams's family that he was arrested and needed Mr. Miller to testify. He denied talking to Williams or his family about the case.

Defendant Williams was convicted of first degree murder for the death of Mr. Johnson, attempt to commit first degree murder for shooting Mr. Donelson, and employing a firearm during the commission of a dangerous felony. He was sentenced to consecutive terms of life imprisonment for the first degree murder conviction, twenty-four years for the attempted first degree murder conviction, and ten years for the firearm violation, for an effective sentence of life plus thirty-four years. Defendant Gray was acquitted of first degree murder but was convicted of attempted first degree murder and employing a firearm during the commission of a dangerous felony. He was sentenced to consecutive sentences of twenty-four years for the attempted first degree murder conviction and ten years for the firearm violation, for an effective thirty-four-year sentence. This appeal followed.

# I

Defendant Gray contends that the evidence is insufficient to sustain his conviction for attempt to commit first degree murder of Mr. Donelson. He argues the evidence fails to show that he shot Mr. Donelson and that he was criminally responsible for the actions of whoever shot him. The State responds that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, first degree murder is defined as the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2010). Intentional is defined as the "conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-106(a)(18) (2010). Premeditation is defined as "an act done after the exercise of reflection and judgment" *Id.* § 39-12-202(d). "[T]he intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* The determination of whether a defendant acted with premeditation is a question of fact for the jury and may be established by direct and circumstantial evidence. *See State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003); *see also State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

Criminal attempt is committed when a person acts with the kind of culpability otherwise required for the offense and:

Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a)(1)-(3) (2010). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

A person is criminally responsible "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a) (2010). Criminal responsibility is a theory upon which evidence may be presented establishing a defendant's guilt based upon the actions of another. *State v. Mickens*, 122 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003). Presence and companionship with another before and after the commission of a crime provide a basis for inferring participation in the offense. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). Likewise, the State is not required to establish that the defendant engaged in a particular act to be criminally liable. *Id.* Rather, the defendant must "'in some way associate . . . with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The evidence shows that Mr. Johnson and the Defendants fought inside the club. Mr. Pettis traveled to the club in a white car with Mr. Goliday, Mr. Lewis, and Defendant Gray. Mr. Goliday knocked Mr. Johnson's drink from his hand, and they began to argue. Mr. Johnson and Gray began to fight, which led to everyone on the dance floor fighting. Mr. Donelson admitted joining the fight because he wanted to help Mr. Johnson, who was his cousin. The fight ended and people began to leave. Mr. Donelson walked to his car, heard gunshots, saw a man pointing a gun at him, and was shot in the stomach. He could not

identify the man who shot him.

After the fight, Jamaica Cartwright saw five men standing at the trunk of a white car and saw one of them loading a gun. She attempted to warn people inside the club that men were loading guns. Ms. Cartwright heard gunshots outside the club and saw that Mr. Donelson had been shot. Cecilia Williams said she heard gunshots outside the club and saw ten men with guns enter the club. Ms. Williams, April and Janice Campbell, and Ms. Cartwright saw Defendant Gray shooting a gun the night of the shooting. Forty-caliber and nine-millimeter shell casings recovered from the scene support the inference of two shooters.

Although the evidence fails to establish the identity of the man who shot Mr. Donelson, we conclude that Defendant Gray is criminally responsible for the shooting. Witnesses saw multiple men standing at the trunk of a white car and loading guns. The Defendants were seen firing guns that night, and Defendant Williams shot Mr. Johnson. The jury could have inferred that either Defendant shot Mr. Donelson outside the club after retrieving the guns from the trunk of the car but before entering the club. Alternatively, it could have inferred that one of the men standing at the trunk of the white car shot Mr. Donelson, as five to ten men retrieved guns from the trunk. Regardless of which inference the jury made, the evidence showed that Gray acted with knowledge that the shooting was going to be committed. His presence and companionship with Williams and the other men who retrieved guns from the car provided a basis for inferring beyond a reasonable doubt that Gray participated in shooting Mr. Donelson. *See Ball*, 973 S.W.2d at 293. Gray associated with the venture, acted with the knowledge that the shooting was going to occur, and shared the criminal intent to shoot Mr. Donelson. *See Maxey*, 898 S.W.2d at 757. The evidence is sufficient.

**II**

Defendant Gray contends that the trial court erred by allowing the medical examiner to testify about the effects of a gunshot wound on a living person. He argues this testimony was outside the medical examiner's area of expertise in performing autopsies. The State responds that the court properly allowed the medical examiner to testify about the effects of gunshot wounds on a living person. We agree with the State.

Tennessee Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Determinations about the admissibility of expert testimony are within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The standard of review is whether the court abused its discretion, and in order to reverse a court's ruling, this court must determine that

the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

Dr. Laboy testified as an expert in forensic pathology and concluded that Mr. Johnson's cause of death was a gunshot wound to the abdomen. The State asked Dr. Laboy "what would that gunshot wound . . . do to a person, and what would be a person's capabilities after sustaining that wound as far as consciousness, the ability to stand, ability to talk – things like that?" Dr. Laboy stated that the abdomen had many blood vessels and that a bullet passing through the area perforated arteries. He said that a person might lose blood slowly and that depending upon how the blood left the organs, a person might be able to perform many tasks. He said that the bullet passed through Mr. Johnson's bowels and into the inferior vena cava, which caused blood loss in the abdomen. He said the wound did not cause "a sudden stop of doing anything." He agreed a person could remain conscious, talk, and move for a period of time after receiving a gunshot wound similar to Mr. Johnson's depending upon the rate of blood loss. He said Mr. Johnson's wounds might or might not have caused significant blood loss.

We conclude that the trial court did not abuse its discretion. Dr. Laboy testified that he was a medical doctor specializing in forensic pathology, and the parties stipulated that he was an expert in forensic pathology. At the trial, defense counsel objected to the relevant testimony on the ground that it was outside the scope of Dr. Laboy's expertise. The court disagreed and overruled the objection. We note that the Defendant has failed to cite authority stating that a medical examiner is not permitted to testify about the effects of a victim's wounds. Dr. Laboy's expertise went beyond determining the cause of death and included determining the effect the victim's wound had on the body. Such a determination was imperative in determining the cause of death. Likewise, Dr. Laboy's testimony regarding the effects of the gunshot wound on the body supported witness testimony that Mr. Johnson was conscious, talking, and moving after being shot and that there was relatively little blood. This issue is without merit.

### III

Defendant Gray contends that the trial court erred during sentencing by ignoring his acquittal of first degree murder and by improperly applying enhancement factors. The State responds that the court properly considered and found the appropriate enhancement factors but that the court improperly sentenced the Defendants regarding the employing a firearm during the commission of a dangerous felony conviction. We agree with the State.

Although no witnesses testified at the sentencing hearing, a presentence report was received as an exhibit. The report showed a 2008 misdemeanor conviction for a weapons violation. Defendant Gray received ten months and twenty-three days' probation. The report showed juvenile adjudications for disorderly conduct, assault, theft of property valued at $500 or less, obstruction of a highway, and a curfew violation. He finished the ninth grade, reported leaving school for disciplinary reasons, reported good health, and denied using drugs or alcohol.

Although the trial court found that no mitigating factors applied, it noted that Defendant Gray did not have a juvenile record that could be used to enhance his sentences. The court noted, though, the "sheer volume . . . of juvenile contacts [.]" The court said that Gray had ten or eleven contacts with the juvenile justice system dating from 2001 and found that youth and inexperience played no role in the instant offenses. The court placed little weight on Gray's not having a substantial criminal history. The court stated that Gray "broke into the adult system with style" and found that he had a previous history of convictions other than those for which he was charged. *See* T.C.A. § 40-35-114(1) (2010). The court found that enhancement factor (10) applied. *See id.* § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high."). The court found that the Defendants fired multiple gunshots into a crowded room. The court placed great weight on the fact that Gray left the club, went to a car, retrieved a gun, returned to the building, and fired the gun.

The trial court stated that it found no logic in the jury's acquitting Defendant Gray of first degree murder and said that it believed he was guilty of first degree murder. The court found that his returning to a vehicle, obtaining a gun, and entering the club was "criminal behavior in addition to that necessary to establish [the] appropriate range." The court stated that a twenty-five-year sentence was warranted because the evidence would have supported a first degree murder conviction. The court stated, though, that based upon its finding two enhancement factors it was sentencing Gray to twenty-four years for the attempt to commit first degree murder conviction and ten years for the firearm conviction, six years to be served at 100%.

The Tennessee Supreme Court adopted a new standard of review for sentencing in *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Currently, the length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708. In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative

-15-

office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

Defendant Gray argues the trial court improperly applied enhancement factors (1) and (10). The presentence report showed a previous conviction for carrying a firearm on school property, a misdemeanor. *See* T.C.A. § 40-35-114(1). The record shows that multiple people were inside and outside the club when he fired his gun. He left the club, retrieved a gun, returned to the club, and fired the gun while numerous people were inside. *See id.* § 40-35-114(10). The court properly applied these enhancement factors.

Although the trial court expressed disagreement with the jury's verdict acquitting Defendant Gray of first degree murder and found that the evidence supported a first degree murder conviction, the court has authority to make such a finding. In any event, after the court discussed its disagreement with the verdict, it stated that the sentence was based upon the two applicable enhancement factors. We conclude that the court did not enhance Gray's sentence because it found that he was guilty of first degree murder.

Although we affirm Defendant Gray's sentence for attempt to commit first degree murder, we conclude that the trial court improperly sentenced the Defendants to ten years for the employing a firearm during the commission of a dangerous felony convictions. Tennessee Code Annotated section 39-17-1324(h)(1) (2010) states that employing a firearm during the commission of a dangerous felony is a Class C felony, punishable by a mandatory minimum six years' confinement. The mandatory minimum sentence becomes ten years' confinement only when a defendant has a prior felony conviction. T.C.A. § 39-17-1324(h)(2). The record shows that the Defendants did not have previous felony convictions. As a result, the maximum sentence allowed by law was six years' confinement. *Id.* § 39-35-112(a)(3) (2010) (stating that a Range I sentence for a Class C felony is three to six years). We reverse the Defendants' judgments for employing a firearm during the commission of a

dangerous felony and remand for entry of judgments reflecting six-year sentences. The judgments should reflect an effective thirty-year sentence for Defendant Gray and an effective sentence of life imprisonment plus thirty years for Defendant Williams.

**IV**

Defendant Williams contends that the evidence is insufficient to support his convictions for attempt to commit first degree murder and employing a firearm during the commission of a dangerous felony. He argues that no evidence was presented showing that he shot Mr. Donelson. The State responds that the evidence is sufficient. We agree with the State.

Regarding the attempt to commit first degree murder conviction, the evidence shows that after Mr. Johnson's drink was knocked from his hands, Mr. Johnson and Defendant Williams began fighting. April Campbell saw the Defendants and the people with the Defendants "jump[]" Mr. Johnson. Mr. Donelson joined the fight to help Mr. Johnson. The fight ended, people began to leave, and the Defendants ran outside. April and Janice Campbell saw Williams reenter the club with a gun and shoot Mr. Johnson. They also saw Defendant Gray fire a gun.

April Campbell saw guns in the trunk of a car parked near the front door when she arrived the night of the shooting. Jamaica Cartwright left after the fight, saw five men standing at the trunk of a white car, and saw one loading a gun. Ms. Cartwright heard gunshots outside the club, noticed Mr. Donelson was shot, and saw a man with a gun enter the club. Mr. Donelson left the club after the fight and was shot before the Defendants returned.

Cecilia Williams ran outside the club during the fight involving Mr. Johnson and the Defendants, and the other people on the stage. She saw a car near the front door, saw about ten men retrieve guns from the car, and saw Defendant Williams take a handgun into the club. She said she heard gunshots inside and outside the club. Forty-caliber and nine-millimeter shell casings recovered from the scene support the inference of two shooters.

Although the evidence fails to establish the identity of the man who shot Mr. Donelson, we conclude that Defendant Williams is criminally responsible for the shooting. Witnesses saw multiple men standing at the trunk of a white car and loading guns. The Defendants were seen firing guns that night, and witnesses testified that Williams shot Mr. Johnson. As we have stated, the jury could have inferred that the Defendants shot Mr. Donelson outside the club after retrieving the guns from the trunk of the car but before entering the club. Alternatively, it could have inferred from the evidence that five to ten men

retrieved guns from the trunk of the white car and that one of the men standing shot Mr. Donelson. Regardless of which inference the jury made, the evidence showed that Williams acted with knowledge that the shooting was going to be committed. His presence and companionship with Defendant Gray and the other men who retrieved guns from the car provided a basis for inferring beyond a reasonable doubt that he participated in shooting Mr. Donelson. *See Ball*, 973 S.W.2d at 293. Williams associated with the venture, acted with knowledge of the shooting, and shared the criminal intent to shoot Mr. Donelson. *See Maxey*, 898 S.W.2d at 757. The evidence is sufficient.

Relevant to this appeal, "[i]t is an offense to employ a firearm during the commission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). Witness testimony established that Defendant Williams entered the club with a handgun after the fight with Mr. Johnson and shot Mr. Johnson. The evidence is sufficient.

## V

Defendant Williams contends that the trial court improperly instructed the jury on criminal responsibility regarding attempt to commit first degree murder. He argues the evidence did not warrant the jury instruction. The State contends that the court properly instructed the jury. We agree with the State.

As we have previously stated, the evidence is sufficient to support Defendant Williams's attempt to commit first degree murder conviction. Although the evidence fails to establish the identity of the man who shot Mr. Donelson, the trial court did not err by providing the criminal responsibility instruction. Witnesses saw multiple men standing at the trunk of a white car and loading guns. The Defendants were seen firing guns that night. The jury could have inferred that either Defendant shot Mr. Donelson or inferred that one of the men standing at the trunk of the white car shot Mr. Donelson. Regardless of which inference the jury made, the evidence showed that Williams acted with knowledge that the shooting was going to be committed and shared the criminal intent to shoot Mr. Donelson. *See Maxey*, 898 S.W.2d at 757.

In consideration of the foregoing and the record as a whole, we affirm the Defendants' convictions, but we reverse the employing a firearm during the commission of a dangerous felony judgments and remand the case to the Shelby County Criminal Court for entry of judgments reflecting six-year sentences.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE